## EDMUND SWETT & AL., Appellants, *versus* OFFIN BOARDMAN.

There must be *publication* of a *will.*

THIS was an appeal from a decree of the judge of probate establishing a certain instrument as and for the *last will and testament* of *Offin Boardman* deceased.

The appellants were heirs at law of the deceased. The appellee was also one of his heirs at law, and named executor and principal and residuary legatee in the instrument.

The appellants filed the following reasons of appeal, viz. :—

*First*, that the deceased was not, at the time he signed the said instrument, of sound and disposing mind, but his mind was then greatly impaired and weakened by reason of old age and sickness.

*Secondly*, that the said deceased, at the time of signing said instrument, supposed and believed it to be a common deed of bargain and sale for the conveyance of certain land, and did not know or suppose that the said instrument purported to be his last will.

*Thirdly*, that the said instrument, and signature of the deceased thereto, was obtained and procured by fraud and circumvention ; and the said deceased, at the time of his signing the said instrument, being then of weak and unsound mind, was *made* and suffered to *suppose and believe*, that the said instrument was a common deed for the conveyance of certain land.

[ * 259 ]    *And *fourthly*, that the said deceased never *pub lished* the said instrument as and for his last wil. and testament.

At the term of this Court holden in this county in April, 1803, *Sewall* and *Thacher*, justices, sat in the trial of this appeal, and their report is made as follows, viz. :—

" The appellants opposed the probate of a certain instrument exhibited as the last will of *Offin Boardman*, late of *Newburyport*, deceased ; having appealed from a decree of the judge of probate establishing it, and having filed their reasons of appeal.

" The appellee, repelling and denying each of the reasons of appeal, exhibited this instrument for probate in this Court. Two of the subscribing witnesses, and the deposition of a third subscribing witness, to this instrument were produced. From their testimony, and the testimony of several other witnesses who were examined for the parties, and from the consent of the parties in some circumstances, the justices of this Court, who sat in the trial of this appeal, have collected the following state of facts, viz. :—

" The appellee, who, in the instrument offered for probate, is named principal and residuary legatee and executor, went, in the lifetime of his father, about the 12th of April, 1802, to a Justice *Pike*, and gave him certain minutes, according to which Mr. *Pike* was requested, by the appellee, to prepare a will for his father, the deceased *Offin Boardman*. One article of the minutes stated a bequest to the wife of the deceased, whereby one third of his per-

sonal estate, and one third of his real estate, for her life, were to be given her in lieu of her dower. Upon these minutes, the instrument exhibited was prepared by Justice *Pike*, and about the 13th of April was delivered to the appellee. The *in- [ * **260** ] strument appeared conformable to the minutes, excepting that the provision was entirely omitted.

" According to the testimony of Justice *Pike*, this omission happened by his entertaining an opinion that the widow of the deceased would be entitled to the same provision as the minutes directed, notwithstanding the *will*.

" On the 21st of April, the appellee was seen at his father's. He passed by a resident in the same family, went abroad to two of the subscribing witnesses, who lived or worked in the neighborhood, and applied to the other subscribing witness, a woman, who resided in a distinct part of the father's house. To each of these witnesses the appellee expressed a request to go to his father's house or room, and witness the execution of a deed. They accordingly attended. One of them, *John Tufts*, arrived before the others, and was with the deceased about five minutes during the absence of the appellee. *Tufts*, when he entered the deceased's room, saw a paper, folded up, lying on the table, and the deceased sitting about two yards from it. He asked the witness, at his going in, whether he was not named *Tufts*, and desired him to sit down. The other subscribing witnesses came in with the appellee, who immediately took a pen and put it into his father's hand, saying, ' Now, sir, if you will sign *it* or *this*.' The deceased then rose from his chair, and, taking it with him, placed himself at the table where the folded paper lay, and, without reading or examining it, signed it with his name, being the instrument exhibited. The three subscribing witnesses then wrote their names upon the same paper, and at the same table, while the deceased remained at or near it. The instrument was left on the table. The deceased said nothing *during the transaction. The subscribing witnesses [ * **261** ] had no notice that they had written their names to a *will*. Nothing was said at the time, in their hearing, of the nature of the paper which had been executed by the deceased. One of the subscribing witnesses suspected, from the circumstance of three witnesses, that the instrument was a *will*. The subscribing witnesses had no other conversation with the deceased, and could not testify as to any particular observation of the state of his mind, and almost immediately after the transaction withdrew from the room. The deceased, at the time of this transaction, was nearly eighty years of age. For more than a year preceding it, he had discontinued business, and had given up his concerns to his partner. For

all *that* period, the deceased had been distressed with a painful swelling in his head, near his neck, of which he at several times complained that it almost distracted him; and he had been otherwise infirm and sick, was very deaf, abstained very much from conversation, and omitted reading his Bible, as he had been accustomed to do, especially at his family prayers. There was no evidence that, within a month of his death, he had been seen to read any book or writing. But in *that* period, the deceased conversed several times with his brother, and his partner, who paid the deceased several sums of money, arising in the course of their business, upon statements made by the partner, but which the deceased did not attempt to examine.

" Some testimony was also received by the Court, from which it appeared that an application had been made to the deceased, by a Mr. *Cutler*, for the purchase of a piece of land belonging to the deceased, adjoining, or parcel of, his homestead, who [ * **262** ] agreed to sell it to him. *Afterwards, the deceased told Mr. *Cutler* that the land was wanted by his son, the appellee; and, on the 18th of April, two days before the execution of the supposed will, *Cutler* and the appellee were with the deceased, and it was concluded between them that *Cutler* should not have the land he had applied for, because the appellee had determined to become the purchaser of it from his father. On the 26th of April, on the *Saturday* next after the execution of the instrument exhibited, the supposed testator was more violently seized, became very sick, and on the 28th died."

SEWALL, J. The only exception assigned in the reasons of appeal, which the Court takes notice of, is the want of publication of the instrument as and for the last *will and testament* of the deceased. The question arising from the facts stated is, whether there has been a publication. I do not find any cases which have been decided expressly determining what amounts to a publication; but there must be proof that the person knew the instrument to be his *will*—that he intended it as such. In the case now under consideration, there is no evidence, excepting the signature of the deceased, of these facts. I do not think that any particular *ceremony* of publication is necessary, or material; but the deceased ought at least to have known and understood that he was executing his *will*. There is no evidence that he had any idea of that being the fact; but, as far as the evidence goes, it proves the contrary.

SEDGWICK, J. The statute 1783, *c.* 24, does not expressly require *publication*, nor is there any thing to be found in the books directly in point on the subject. But, in my opinion, it ought at least to appear that the person knew he was executing his will, and

that he communicated *that* fact to those who were called
to attest the same as witnesses; and *this is necessary [ * 263 ]
to prevent imposition, from the situation in which per-
sons frequently are at the time of executing these instruments. In
the present case, there are no circumstances, there is no kind of
evidence that the deceased knew or supposed that he was executing
his will, or that he even suggested it to the subscribing witnesses;
but, as far as a negative can be proved, the reverse is proved, *viz.*,
that he did not know or suppose that to be the fact.

DANA, C. J. No precise *form* of publication is necessary. There
is one case in which it is said that where these words, " *take notice*,"
were used, it was sufficient. That was, in my opinion, carrying it
a great way. That case, however, was not finally determined. But,
in the case now before us, nothing was said as to what the deceased
was doing, nor is there a particle of evidence that he knew he was
executing a will: rather the contrary. The circumstances in evi-
dence respecting the deed, make it probable that he thought he was
executing the deed. As to the minutes carried to *Justice Pike*, ad-
mitting the minutes were *sent by the deceased*, they were not follow-
ed. The devise to his widow was left out. But to go back, there
was nothing said, nothing done, excepting barely the signature,
which indicated an intention in the deceased to make a will. These
circumstances, taken into connection with the advanced age, and
the *then* situation, of the deceased, and his death shortly after, are
conclusive to show that the instrument exhibited ought not to be
established as his will. (1)

*Decree reversed*

(1) It is laid down in most of the elementary works, that *publication* of a will is an
essential part thereof. Still, however, if by *publication* it is meant that the testator, at
the time of the execution of the will, should make known to the witnesses that the
instrument they are called upon to attest is his will, it may be doubted whether pub
ication be necessary to its validity. It is requisite, to prevent imposition, that it
should appear that the testator knew the nature of the instrument he executed. Any
thing more would seem to be superfluous. It would hardly be contended that a will
*in the hand-writing of the testator*, would be invalid because the witnesses were not
apprized that it was a *will* to which they had attested. Indeed, it has been decided
that, where the witnesses were deceived by the testator, and induced to suppose that
he had executed a deed, and not a will, it being delivered as his *act and deed*, and the
words " sealed and delivered " put above the place where they were to write, that
this was a sufficient execution.—*Trimmer* vs. *Jackson*, Burns' *Eccl. Law*, 117.—This
has been called a publication; but surely the instrument was not published *as a will*
Vide the case of *Peate* vs. *Ougly, Com. Rep.* 197.